May it please the court. I'm Don Webb. I'd like to reserve five minutes for rebuttal. I represent a group of scientists who are trying to protect the western sage-grouse from extinction under the Endangered Species Act. This case concerns the sufficiency of the initial 90-day finding on a petition under the ESA that we submitted. A positive finding at this stage does not list the species. All it means is that the species qualifies for a full review by the U.S. Fish and Wildlife Service within 12 months. Let me ask you a preliminary question, counsel. There are other proceedings pending, are there not, in respect to listing or protecting of the grouse? There are other proceedings pending with respect to the eastern sage-grouse, a different subspecies, we believe. There are no additional proceedings pending with regard to other sage-grouse at this time. There have been other cases, but this is the only case that involves this subspecies. The service considered and rejected the species to which this subspecies belongs and rejected that for listing. And there hasn't been any appeal of that or any further proceedings? Not to my knowledge. We are not involved in that case, but I have checked on it periodically and it has not appealed to my knowledge. So the overall species is not considered appropriate for listing, so the question is whether either the eastern or the western subspecies should be listed? Exactly. In fact, the question is whether the eastern or western subspecies exist. The service has recognized its existence for about 50 years, and when we filed a petition they said it doesn't exist. That's really the crux of the question here. Now, the 90-day finding language was added to the Act in 1982. Congress was dissatisfied with the Act and decided to add that in order to speed up listings. And the Joint Conference Committee had a statement on the bill, this is 1982 U.S.C. CAN at 2861, and they said that petitioners need only present information sufficient to indicate that listing may be warranted and that a status review should be conducted. And that's all we're asking for is just that the service conduct a full status review on the subspecies. And there's evidence as to how low the service itself sets this bar. In Appendix C, they provide some instruction to their employees as to what would not be appropriate for listing. And the example they chose was someone who petitioned to add a human fetus as a species. And that's the sort of thing that doesn't muster under the 90-day finding. Of course, an individual human is not a species beyond any other issues involved. Would you elaborate on what you call a full status review? I mean, I understand that, in effect, you want it to be remanded so there is some texture put on their finding rather than a bare conclusion. But what would a status review involve? The 12-month determination? Well, we would have to reverse in order to meet your objective on the 90-day review, correct? So in doing that, what would be the practical effect of that? The practical effect is that they would redo the 90-day finding. Now, their attorneys have done some fairly good analysis of it, but it's a post hoc rationalization. We expect the service to adopt on remand, to adopt some of their attorney's arguments. And then they would then issue another 90-day finding. We would look at that finding, and if we thought that it was legally passes muster, then we would stop our ‑‑ the litigation would stop there. We would not stop our ‑‑ The likelihood is if they don't change their mind, you know, do a total somersault, they would come back and say that there's no subspecies and would simply beef up the explanation based on the documents in the record. Isn't that what you would expect to happen? Yes, they would connect the dots, similar to what is required under the home builder's decision. And I can get to that in a second. At that point, practically, you asked a practical question, what we would do is conduct more science. Well, wouldn't you expect the service to conduct more science? They might. Is that an obligation for them or not? No, it is not. They just look at what's out there. They look at the best available scientific information. In effect, what I'm having some difficulty with, and maybe not articulating because I don't know the precise process, is there is a record out there of scientific opinions. They're not ‑‑ they're, some of them, opaque at best, at least the ones we've been offered. Would you contemplate, if there's a remand, that there actually would be an opening up of the record? It would be a new record. They would make a new finding. It would be a new record. It all goes back to, take another look at the petition. We anticipate that there's at least one new genetic study that would be included in that record, and I can't talk about it because it's not in the administrative record. That's fine. I'm just asking as to whether there would be more stuff, you know, offered by both sides. We think there would be some more stuff. Okay. Now, the service has argued that this case involves a battle of the experts. We disagree. There are really two issues here, two categories of issues. The service ignored important information in the petition, and it ignored many statements by its own experts, and really it looks like kind of a selective inclusion. And secondly, they frequently use the wrong legal standards in their finding. Now, there's three phrases in the 90-day requirement, B3A, Section B3A, subsection. One is substantial information, and that's defined by a regulation as it refers to an amount of information. Second, the word indicates is used. And third, may be warranted. So if there is substantial information in the petition, the amount that would lead a reasonable person, and, of course, the reasonable person is a judicial creature, so the court can certainly make that decision on its own, that a listing may be warranted,  There are problems with the resolution of ambiguities with the definition of subspecies, and there's a case where they used is as the legal standard. That's on page 6500 of 68 Federal Register Volume. And instead of using the word may, they used the word is, and we take issue with that. Now, there's a question about defining subspecies and dictionaries. Now, subspecies is a word that Congress used. Congress added that word. It's in the statute. And the goal, of course, of the court is to discern the intent of Congress. So the service didn't like our dictionary, so they said, well, let's use this other one, a specialized technical scientific dictionary. And we think that an ordinary dictionary should be used because that's what Congress probably used. They also offer up a patent case, multi-form desiccants. In that case, we think actually the court ---- Let me ask you, do you think that the definition of subspecies is a matter within the general province of the Well, we think it's both. We think it's a legal question and a common, ordinary definition should be used. The definition could be within the services province if they chose to do so in a rulemaking and put it in the Code of Federal Regulations. But for whatever reason, they've decided not to do that. Do we have examples of other cases where they have determined that there is a subspecies? There have been other cases where they have determined what is a subspecies. Other cases, but other register notices. They're not ---- We have them. They're not before this Court. Well, it seemed very odd to me that the agency charged with determining what is a subspecies doesn't have, you know, a history of having determined what a subspecies is. And I had cases. It's very odd when it's their job. We mentioned one, and that's the Clover case that we discussed in our briefing. And that was ---- Actually, I do not recall at this moment. I may misspeak if I say it's a subspecies or a distinct population segment. But there the service looked at behavior, behavioral similarities or differences. It's the same overall behavior that they may choose different nest sites. And all these birds mix. And yet when they look at our birds and they don't have any examples of the subspecies mixing, what they have are three adult birds and a couple of brood with one adult that move to an area where they say right in their register notice, top of column three, I think it's on page 6501, that it moved to a ---- that's an intermediate form. So we have a subspecies, three individuals moving to an intermediate form, and we have no studies as they admit elsewhere in their register notice. I guess the following up on Judge Fletcher's question, it's a matter of public record of cases, other cases, even if it's not a matter of this record. Do those cases set out factors for determining subspecies? I have not seen any, Your Honor. The distinct population is that, you know, that seems to have been defined in the circular from the agency. But we'll wait and we'll ask the government. I have not seen any. And what I do know is there are no circuit cases on the subspecies issue at the 90-day level with this legal standard. There's a question about taxonomic experts. The service in the record admits that it consulted only a single taxonomic expert, Dr. Banks, and he says, well, you know, it may be a weak case. Now, our view for a subspecies, our view is that actually if it is a weak case, then they should do a full review and make a real decision so that they should enter a positive 90-day finding and then go on to that full review under the 12-month finding where they do consider all the information they can find. Now, then they offer Dr. Braun, and we know Dr. Braun. We've worked with Dr. Braun. And he is a sage-grouse expert, but he is not a taxonomic expert, nor does the service claim he is until in the briefing. So we think that this difference of taxonomic opinion doesn't really exist. Now, if the service wants to consider Dr. Braun a taxonomic expert, then that should have been in the record. That should have been in the finding or somewhere else in the record that they say he's a taxonomic expert, and they would explain why. And let's just look at what this Court has done before with something that's really pretty similar, and that is the Home Builders case, National Association of Home Builders v. Norton, 340 F. 3D 835. And this Circuit decided that case in 2003. Now, the service there didn't enter findings on some information, and the Court had problems with that. And let me give a couple of examples. For example, the service gave a map of the range of the pig meow in its findings. But they never stated, they didn't connect the dots, they never stated that that map showed a major geographic area, which was a legal question at issue in that case. And this lack of connection by the agency meant that the conclusion was rejected by this Court. It's on page 849 of the F. 3D volume. The second example in that case, the service also found that populations with low genetic variation are at risk of extinction. And everybody, I think, would agree with that. But they did not make a finding that the pig meow had low variation, genetic variation itself. And so the Court had to reject that conclusion. Now, there was post hoc rationalizations by the service's attorneys, just as there are here, but at page 847 it rejected that conclusion by the agency because it simply wasn't in the agency's record. Now, I mentioned there was no evidence of mixing and that it was speculative on the agency's part. And, you know, actually if there is mixing, there could still be a subspecies, and we've briefed that. But let's look at the speculative issue on excerpt of record page 3. The service says that mixing potentially occurs. So let's look at home builders again. This Court rejected a very, very similar argument there. There's no evidence of genetic differences in pig meow groups, and, quote, We reject this argument because the service found only, quote, potential genetic differences, pages 850 to 851. So we think that if this Court follows its prior decision in the home builder's case, that it would have to remand this to the agency, and that's really all we're asking for. Then there's a question about the benefit of the doubt. The service says that, well, this is exactly the same language in the two sections of the statute, but the statutory sections are really designed to do different things, and so you should interpret the exact same language differently. We don't think that comports with the case law, and we don't think it even makes sense. Now, the ESA represents, quote, institutionalized caution, unquote, on the part of Congress. The legislative history recognizes this, and the cautionary principle is reflected, quote, in literally every section of the statute, unquote, as well as the policies of the Act. And that's in TVA v. Hill, long-held case law by the Supreme Court. And, you know, I don't think you can get a more clear statement of the policies of the Act in every section language I think is also telling. Now, what we think happened probably by Congress is when they drafted this Section 7 amendments, which is where that phrase comes from, they simply used the exact same phrase they had already used before in Section 4. And, of course, they probably meant to carry along everything that that phrase means, everything that it carries along. And, of course, there's a great deal of case law that says that identical terms in different parts of the statute, of the same statute, are to be given the same meaning. And I have not seen any places where that case law says except for, you know, except in the statute. This section seems to do something else. And let me next talk about the Benedict genetic study. Now, this was carried out by a graduate student at University of Denver, and the authors expressly state right there in their study that their study should not be used to eliminate the long-recognized subspecies definition or distinction without additional, and I'm quoting, morphological, behavioral, and genetic studies, end quote. The service's own expert, one of their own biologists, calls this to their attention. That's at excerpt 3, page 3, line 12. But the service went ahead and relied on that study to not recognize the subspecies anyway. Now, maybe they could do that if they had explained why, but they didn't. The service ignored sample size problems in that study on this case, but they relied on the sample size problems to avoid listing another bird, the monosage grouse, and that's one of the other species that, you know. Did you want to save time for rebuttal? I did. I thought I saw my clock moving when I asked for an extra five minutes. No, you don't ask for an extra five minutes. You take it out of your time. Oh, I'm sorry. You have a minute and a half left, so maybe you want to reserve that. A minute and a half then. Thank you. You don't have the power to grant time. May it please the Court. My name is Lane McFadden for the Department of Interior. The statutory requirement that the petition present substantial commercial and scientific evidence indicating that listing may be warranted is a qualitative, not a quantitative, requirement. The Institute's proposed standard that the amount of information be the sole basis on which the service make its findings, simply an unworkable mechanism. Granted, the Institute's petition is quite lengthy. It's 468 pages, as they point out several times, but it's filled with historical information and ecological information about the greater sage grouse across its range. What the petition would have had to have included is specific information about the eastern or, sorry, the western population of the sage grouse, the former western subspecies, and its distinction between its eastern neighbors and other sage grouse populations. That is the information that is lacking. And the burden to provide this information is placed on the petitioner in the listing process. Absent that information, the Fish and Wildlife Service's finding that the listing is not warranted is due considerable deference from this Court. This is, as the Court recognized in National Association v. Homebuilders, the type of decision that implicates substantial agency expertise. And this Court went on to say that an agency must have discretion to rely on its own experts, even when, as an original matter, a court may find contrary evidence more persuasive. One of the things that we see when we are benchmarking findings against agency expertise is that we see some, you know, definitions or agency guidelines or agency criteria, and then there may be conflicting scientific decisions, but we say, well, that's within the range. Is there somewhere a definition used by the Department for species? Are you asking about subspecies? Subspecies, excuse me. No, Your Honor. There is no universal definition of subspecies. That seems very odd, since your agency is in that business. Well, it may strike you as odd, and it did me as well, but the reason for that is because what determines taxonomic classification is very different if you are a botanist, say, than if you are an entomologist or if you are studying birds or studying fish. There are different characteristics you might consider. I mean, if you're looking at a flower, say, like the meadow foam flower, which is something that occurs much in the Pacific Northwest, the taxonomic classification might be based on that. Does your agency classify flowers as endangered species? It does have that. There are some plants that are within. There are endangered plants. Endangered plants. That's correct, Your Honor. Just as there are. But is there within, you know, fish, plants, wildlife, even within those broad categories, are there any broad definitions that the agency uses? There may be. There are sort of certain expert texts which the employees of the agency refer to, depending on what type of animal or plant it is. So we know this isn't a flower, so we don't have to worry about what the botanists think. That's correct. We don't even need to know about what people about butterflies think, right? That's right. But that is the reason why the people who study butterflies can't be bound by the exact same definition of subspecies that people who study flowers or people who study fish can be, that there has to be some. When was the last time that the agency said that, had used or said that these grouse were a subspecies? Wasn't it as recent as like five, seven years ago? Yes, Your Honor. Actually, I think it was more recently than that. I think in the 2001 finding on the Washington population, which was found to be a distinct population segment. And just to clarify something that was said in the argument, the Fish and Wildlife Service did issue a 12-month finding, a positive finding for that population of sage grouse and said that listing of that population is warranted, but unfortunately is precluded due to a lack of resources. There are currently over 200 species, subspecies, and distinct population segments that now have that particular classification. So why, how is it possible to make that classification and then simply flip on this one? Well, there's two answers to that. One is that they're studying two very different populations, the Washington population and the Oregon population. The other is that that finding did not require a review of the taxonomy because it was petitioned to be listed as a distinct population segment, and they investigated that question. Okay. Let me just start. Was that finding both as to subspecies and to distinct population segment in the case of the Washington population? I don't want to misspeak, so I'm not entirely sure about what the subspecies investigation was. I mean, the service in 1985, based on the American Ornithological Union's checklist of species, did list the western sage-grouse as a subspecies in a table of species that it considered what were known as Category 2 subspecies at the time. These were potential candidates for listing, and that system is now defunct. There is no Category 2 listing system. But that table was repeated several times over the years in the Federal Register. And so there are, to that extent, there are recognitions of the western sage-grouse as a subspecies, but never has there been a taxonomic inquiry conducted by the Forest Service to determine whether or not it agreed with the AOU's classification of the western sage-grouse as a subspecies. There simply was never an opportunity or reason to conduct that until the ---- Okay. Let me just ---- yeah. You have a lot of information packed in there, so I just want to make sure I understand it. This category that it was a subspecies, you once said Forest Service. Did you mean Fish and Wildlife? I did mean Fish and Wildlife Service. I apologize. I just want to make sure we're still in the Department of Interior. We haven't moved to the Agriculture Department. Yes, Your Honor. You're right. I'm sorry. So we're still in DOI. Okay. So the Fish and Wildlife had categorized this western grass as a subspecies at least as early as 1985 and then repeated that later. For the sake of clarity, it did acknowledge the subspecies categorization as the AOU had determined it. It was the AOU, which is an independent body of scientists. Right. And is not a governmental agency. They have a checklist of species, which the Fish and Wildlife Service very frequently relies on and had in listing that subspecies. But in doing so, it had not revisited the evidence which supported that taxonomic classification and never really had considered it because there had been no need to. I mean, Your Honors asked whether there had been previous decisions based on, you know, whether something was a subspecies. And the fact is that rarely is there a lack of unanimity in the taxonomic realm. I mean, these petitions don't often involve a dispute over whether or not the initial taxonomic classification of the subspecies is valid. And so that is why a lot of these findings don't consist of a lengthy, detailed discussion of what does and does not constitute a valid subspecies for purposes of the Endangered Species Act. But I want to point out there's several comments in the reply brief made about whether or not the Fish and Wildlife Service has the authority to overturn, as the Institute puts it, the AOU's classification of the Western sage-cross as a subspecies. And, of course, it does. The Congress delegated the authority to implement the Major Species Act to the agency. And so, of course, the agency can't be bound by it. That seems to make perfect sense. You can't bind them by this outside scientific group. But to the extent that it's at least adopted informally and it's accepted up to a point, it would seem that you would at least need some better articulation than you have here to simply say, you know, sweep that by the side and say, voila, we've now changed our mind or we take a whole different view. That's what's troubling me here is that maybe this is the answer, but I'm wondering if they really did the kind of analysis that would permit us to even make a determination whether it's arbitrary and capricious. Well, Your Honor, the finding is quite transparent about what information it relies on in determining why they no longer believe the subspecies classification to be valid. And despite the comment that all of our arguments in briefing are post hoc, they are, in fact, based on statements made in the finding. There are citations to the studies and a discussion of what factors the agency considered. The agency considered the morphology of the bird, meaning its physical appearance, which, of course, was the sole basis of the classification in the first place. Dr. Aldrich said, well, these appear to be darker than their eastern counterparts, and that merits classification as a subspecies. And as Dr. Richard Banks, which, as the Institute pointed out, he is the current chair of the AOU's committee on nomenclature. He works at the National Museum of Natural History. He reviewed the exact same specimens and said, well, yeah, I can see what Dr. Aldrich was talking about. They are somewhat darker, but no current taxonomist would ever make a subspecies classification based on that distinction. But he also says, he says it's weak, but that it should not be ruled out. So it seems to me that more, your own scientist seems to tell you more needs to be done. Well, certainly, Your Honor, scientists are always reticent to make conclusive statements. They're not willing to say that they would know something with absolute certainty. Do you think they're worse than lawyers on that subject? I'm going to. You don't have to answer that question. Thank you. But the service, of course, is required to make a finding, even if the, even if more studies would be preferable. And, of course, more studies are often preferable in these situations. But the service does not have the option of stating that it cannot make a finding on the basis of the evidence being inclusive.  And, of course, it can't also say that we are required to make a positive finding because we would prefer more study to be done. The 12-month status review process, which is the result of a positive 90-day finding, does not obligate the service to conduct scientific, more scientific research on its own. Its obligation is to review that which has been done. Well, what would happen if we said you have to do the 12 months? What would you do? Well, I think the proper remedy, Your Honor, would be to, if this Court disagreed with the 90-day finding, to the remand, the district court remanded the agency to ask it to reconduct the 90-day finding. But to order a 12-month finding, the practical result would be that the same information which was considered for this finding would be reconsidered for the 12-month status review. The service is not aware of any additional information which would overlook, and certainly the Institute has pointed to no information, with the single exception of the new genetic study, which I did not know about until today. There is no allegation here that the 90-day finding didn't review all of the available literature, and certainly this review was conducted by agency experts who do work with the sage-grouse populations and are very well aware of what the available information and research is. And so the practical effect would be that the 90-day finding process would be completed or would be repeated, essentially. Kagan. Well, would you – are you asserting that if it's unclear from the evidence that's been presented whether this is a subspecies or not, that you can just stop there and say, so it's not a subspecies because things are in doubt? Well, no, Your Honor. It has to be more than somewhat in doubt. I mean, there is no good positive basis for maintaining the classification. And, of course, the Endangered Species Act only permits the listing of certain entities, an entire species, of course, then a subspecies or a distinct population segment, which is precisely why the service then said, well, if it isn't listable as a subspecies, we have to investigate whether or not it can be classified as a distinct population segment, which is what the service did for the Washington State population of sage-grouse. It said, well, it is a distinct population segment, which could be potentially listable. And so, of course, in this finding, the service then did investigate that. And that investigation, the point or the part of that investigation which requires the service to determine whether or not the DPS is discrete, involves a lot of the same considerations that the service take into account when looking at whether it was a subspecies, whether there were behavioral differences, whether there were behavioral differences. I thought that the 90-day study said something to the effect that there weren't any behavioral differences. And yet the service's own document said that there were important behavioral differences. So how do we square that? Well, the only document, there are only two citations in the petition. There's no description of a behavioral difference, nor is the service aware of one. But the petition cites two things. One is Dr. Aldrich's initial study, in which, of course, he only discusses the color of the birds and makes no reference to behavior. They say in the reply brief, well, we miscited that. There is a reference to another Fish and Wildlife Service document that says important behavioral differences. But that document is not actually in the record, and I'm not sure what exact document that is, the citation. I don't know what the basis for the behavioral difference is. But that document isn't part of the administrative record. I don't believe that it is. I mean, it is only to the extent that it is cited in the petition, but it's unclear to me what the document is specifically. And perhaps the institute can answer this question better. But the services, the information, the best scientific and commercial information also, with respect to this factor, the only scientific and commercial information that the service currently has available is that there are no behavioral differences. There's simply no indication of what that might be. And had the petition ---- Can we ask Mr. Webb that question? Please do, because I'm curious what the behavioral difference might be. The service is aware of none. And at the point at which it is aware of none, then that ---- then certainly the service is reasonable in making its finding. And more than reasonable is not arbitrary and capricious in making the finding that it was not a discrete population segment. Of course, they didn't discuss only behavior. They discussed morphology, as we talked about today. They talked about the geographic isolation of the populations and whether or not there is some movement. And, granted, the studies there are, again, not as thorough as one would like, because there's only a certain number of specimens studied. But it does indicate movement. Counsel, in the record, what is your best evidence that this is categorically not a subspecies? There is no single piece of evidence that disproves a taxonomic classification, because that's a scientific determination that requires a number of things to be considered. And I'd say the best support for that is the lack, if I could be so bold as to say, the lack of evidence demonstrating that it should be classified as a subspecies. The only distinction anyone has ever pointed to between the western and eastern sage-grouse is the fact that the western ones appear to be darker in color. And that, too, relies only on 11 specimens, one of which was only a head, which does not provide a very comprehensive review of the morphology of the western and eastern sage-grouse. So this is the single bit of evidence which might suggest the subspecies classification is valid. Could I just stop there? Now we're talking kind of the difference between eastern and western. But before, did I understand you to say these western grouse that live in Washington are different than the ones that live in Oregon? I didn't mean to say that the sage-grouse that live in Washington are western sage-grouse subspecies. They are a sage-grouse. They are part of it. They are Washington's. What are they? They're just grouse that live in Washington. That's correct, Your Honor. They're the distinct population segment of Washington sage-grouse, if you will. Yeah, it does require some precision in labeling, unfortunately. And I, of course, am not a taxonomist, but I'm trying to get all this right. I want to address briefly, I have only a couple of minutes left, a couple of other things, issues raised by Luthell in his argument. There's much discussion in the briefing about the phraseology used in the finding when the service said that listing is not warranted. The objection is that, well, listing only may be warranted. And there's a lot of lexicographical back and forth. But the point is, essentially, that the petition does not provide substantial evidence indicating that listing may be warranted. And the statement is made accurately several times in the finding. But there's a lot of talk about whether or not behavioral traits need to be unique or whether they only need to be different, whether there should be some or there should be a great number. The fact is that there are none. And at the point where there are none, the Fish and Wildlife Service's determination simply cannot be arbitrary and capricious. Oh, and to clarify one further question, there was some discussion of the snowy plover finding. That finding was that the snowy plover was a distinct population segment. And so that finding was made on the basis of discreteness, and there was not a subspecies classification case. So I don't have another example, to give your honors, of the Fish and Wildlife Service having to review the initial taxonomic classification of a subspecies, as they did have to in this case. All of the Institute's objections, essentially, amount to the objection that they had to the genetic study, which the Service relied on, which is to say this study should not be conclusive because more studies should be done. And the simple fact is that the Service is required to make a finding based on the best evidence before it, and that is the best evidence before it. The only evidence we have is that there is no genetic differentiation. And so at the point where the Institute raises the objection that there is no definition of subspecies, this serves only as a distraction from the fact that they admit in their reply brief at the fifth footnote that genetics are, in fact, an important consideration when you decide whether or not something is and is not a subspecies. And the definition that the Service used, looking at its morphology, looking at its geographical isolation, and considering whether it had any genetic differences, is the most comprehensive definition available provided by either party, and there's no objection to the use of any of those factors. So at the point where the Institute cannot point to any reason why any of these should not have been considered in the Fish and Wildlife Service's decision, it simply was not arbitrary appropriations. Unless the Court has any questions. Thank you. Thank you. Well, let me just go to that last comment first. There are many reasons why a single genetic study may not find genetic differences that actually exist, and there are many problems with that study. Now, the behavior document, I have seen that document. It is correctly quoted in the petition. It is incorrectly cited. I am sorry, 468 pages, and we did make a mistake. Where is? I mean, is the document in the record? It's in the footnote in the report. No, I know where it is in your papers, but where's the document? Is it in the administrative record? Well, it should be. We can't find it in our files, and we can't get it from the Service with a FOIA request. So we can't find it. We think that we have a very strong case without that document. All right. You know, the rule by the Service issued says amount. If they want a qualitative, not a quantitative rule, then they should issue one. On deference, there is nothing to defer to here. They simply didn't connect the dots. It's exactly like the home builder's case. From the ad hoc use of subspecies to their ignoring of Dr. Aldrich's 1992 letter, excerpt of Record 74, it's a more modern reference from the petition than the documents that the Service did consider. And Dr. Aldrich states in there that he observed sage-grouse at more than 35 sites. So he clarifies, you know, the sample size issue. But why apply a sample size problem to one thing and not to the genetic study? It doesn't make sense. Thank you. Thank you. I have your argument in mind. My favorite thing about this case is I learned a new word. It was that these are gallinaceous birds, chicken-like. So like Mr. McFadden, I'm not a taxonomist, but I like that new word. So the Institute for Wildlife versus Norton is submitted.
judges: B. Fletcher, McKeown, King